Ellyn BARTGES, Plaintiff,

v.

The UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE, Defendant.

No. 3:94CV113–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Nov. 6, 1995.

---

Vercelia M. Young, Charlotte, NC.

Robert L. Bell, Washington, DC.

Thomas J. Ziko, North Carolina Department of Justice, Raleigh, NC.

### MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the motion of Defendant's motion for summary judgment (document # 15). For the reasons stated herein, that motion will be granted.

### I. BACKGROUND

The Plaintiff, Ms. Ellyn Bartges ("Bartges"), is a former employee of the Defendant, The University of North Carolina at Charlotte ("UNCC"). Her relationship with UNCC began in the summer of 1988 when Bartges contacted Edward Baldwin ("Baldwin"), the head coach of the UNCC Women's Basketball Team, and offered her services as a volunteer Assistant Women's Basketball Coach. Coach Baldwin had a full-time paid assistant, but he accepted Bartges' offer. As a result, Bartges served as an Assistant Women's Basketball Coach during the 1988–89 season. Of course, as a volunteer she was not compensated for her services. Bartges must have done something right because Coach Baldwin allowed her to stay on in her position and offered her some compensation for her services during the 1989–90 season. Bartges was paid an hourly wage, and she received approximately $4,7000.00 for her services that year.

In the summer of 1990, UNCC sought a replacement for its Head Softball Coach, Richard Wiseman. Ms. Judith W. Rose ("Rose"), the Director of Athletics at UNCC, approached on her own initiative and asked Bartges whether she would be interested in the position. When Bartges expressed interest, Rose offered her the position of Head Softball Coach for the 1990–91 year. Bartges accepted the position.

At any rate, Rose, a woman, paid Bartges, a woman, more for her work as Head Softball Coach than Rose had paid Wiseman, the male Bartges replaced. During the last year that Wiseman served as Head Softball Coach, he also taught two courses in the University's Department of Health and Physical Education. The Department of Athletics budgeted $7,950 for his position as Coach, and the Academic Affairs budget paid him $7,950, presumably for his position as lecturer. In contrast, the Athletic Department budgeted $12,000 for the Head Coach position when it was accepted by Bartges. Also, whereas Wiseman was earning a total of $15,900 when he left his position at UNCC,

Bartges received a total compensation package of $20,000.

Bartges was paid more even though she was much less qualified than Wiseman. When Wiseman was hired in 1987 he had seven years of experience as head coach of women's softball at Pennsylvania State University, and his softball team had won four league championships and more than twenty games each season in his last two years with that team. He also had eight years of experience coaching the men's basketball team, his teams had a .714 winning percentage, three league championships, and five conference championships, and he had been named Conference Basketball Coach of the Year in 1985. The résumé that Bartges provided to UNCC at the time of her appointment shows that she had no prior experience in any sport as head coach at the collegiate level, six months of experience as a volunteer assistant basketball coach at another university, six months of experience as head coach of high school girls basketball team, and no prior experience as a softball coach. Nonetheless, Bartges was paid as much or more for her work as Head Softball Coach than Wiseman, the male she replaced.

At this point, Bartges had two part-time positions in the UNCC Athletic Department, Head Softball Coach and Assistant Basketball Coach, and she had a twelve month salary of $20,000 a year. According to the budget for the Athletics Department, $12,000 of Bartges' earnings resulted from her work as Head Softball Coach, and the other $8,000 resulted from her work as Assistant Basketball Coach. Bartges served as part-time Assistant Women's Basketball Coach and part-time Head Softball Coach for UNC Charlotte for the years 1990–91, 1991–92, and 1992–93.

Bartges worked hard for UNCC and was clearly committed to the success of the women's softball team. Unfortunately, Bartges' "can do" attitude caused her to run afoul of the University's regulations. The record shows that Bartges wanted to take the softball team to a tournament over the Spring Break, but her budget contained insufficient funds. For this reason, Bartges contracted with a fund-raiser to sell certain items in

return for 50% of the profits. Bartges and her team did the soliciting.

Bartges never sought the permission of the University to conduct this fund-raising. Rather she conducted the whole operation outside of the University, soliciting purchases, taking in the money from product sales and splitting the profits with the fundraiser. When Rose learned about this activity, she asked Bartges whether it had been cleared with Mark DeMarcus, Rose's assistant, as required by the University's regulations. Initially Bartges told Rose that DeMarcus had approved of the fund-raising project, later Rose learned that this was not the case.

Shortly after this encounter with Rose, DeMarcus sent Bartges a memo asking her to see him about this matter, but Bartges was too busy to meet with DeMarcus for the next three months. About three months later, on January 6, 1993, Rose and DeMarcus had a meeting with Bartges to discuss the unauthorized fund-raising. During that meeting, Bartges told them that she still had the team's share of the proceeds, over $1,000 in cash, held in a manilla envelope hidden underneath the kitchen counter in her apartment. Bartges was severely reprimanded and told that she was lucky she was not losing her job. She was also told that the proceeds from the fund-raising activity would be deposited in the University's general scholarship fund. Of course, this meant that Bartges would not be able to spend the money on a Spring Break trip for her softball team.

The next day Bartges complained to Coach Baldwin that her salary was too low when compared to male coaches at UNCC and that UNCC was discriminating against her because of her sex. Coach Baldwin told her that she could not get a raise immediately because they were in the middle of the budget year, and on January 11, 1993, Bartges filed a discrimination charge with the Equal Employment Opportunity Office ("EEOC") alleging that UNCC discriminated against her because of her sex. On January 14, 1993 she wrote a letter to the U.S. Department of Education alleging that UNCC's Athletic program discriminated against women's

teams in violation of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.* Bartges told Baldwin that she was going to file these charges.

Later, Bartges lost her job as Assistant Women's Basketball Coach when that position was converted to a full-time position and she was not hired for the full-time slot. The reasons for the decision to make the second assistant coach's position a full-time position are disputed. According to Rose and Baldwin, they decided to make the second position a full-time position after Rose attended a conference for Directors of Metro–Conference athletic teams, the teams UNCC competes against, and learned that other women's basketball teams had two full-time coaches. Rose asserts that she decided to upgrade the part-time second assistant coach position to a full-time position in order to keep the women's program competitive. Rose and Baldwin maintain that although they discussed and agreed upon this matter in the Fall of 1992, they put off the job search until after the 1992–93 season in order to accommodate Baldwin's hectic schedule.

According to Bartges, Rose upgraded the position so that she could fire Bartges in retaliation for filing her sex discrimination claim. She believes that Rose and Baldwin never discussed upgrading the position until she filed her sex discrimination charge, and that is why Baldwin and Rose were not trying to fill the position in the Fall of 1992. Of course they were not looking for an applicant in the Fall of 1992 she asserts, they had no reason to look for an applicant yet, because they had not decided to fire Bartges in retaliation for filing her sex discrimination claim.

In any event, after the 1992–93 basketball season, Coach Baldwin began his search for a second full-time Assistant Women's Basketball Coach. Bartges applied for the position, but only after she was invited to do so by Rose and Baldwin. After reviewing over fifty applications, Coach Baldwin selected three candidates to be interviewed: Bartges, Ms. Tolonda Rose, and Ms. Joanne Boyle.

The candidates were interviewed by Baldwin, Judy Rose and Mark Colone, an Assistant Director of Athletics at UNCC. Following the interviews with these candidates, Coach Baldwin decided to employ Tolonda Rose as a full-time assistant women's basketball coach. According to Baldwin he selected Tolonda Rose (another woman) because she had three years of head coaching experience at Barber Scotia College; she had been a member of the women's basketball team for four years at UNCC and had graduated from UNCC; she understood the program and agreed with Baldwin's coaching philosophy; she was extremely enthusiastic about the opportunity to coach at her *alma mater*; she had good interpersonal skills; and she presented a good, professional image.

Judy Rose and Colone also recommended Tolonda Rose for the assistant coach position. According to Colone, going into the interview he was impressed by the good academic performance of the athletes Bartges worked with; but after the interview he had an unfavorable opinion about Bartges because she wore casual attire to the interview (shorts and a short-sleeved polo shirt). Also, when he asked her why she wanted the job Bartges told him that she needed the money. This gave Colone the impression that Bartges was motivated by the income, not success. The scores that Baldwin gave the applicants immediately after their interviews confirm Colone's testimony in part (on an ascending scale from 1–5 Baldwin gave Bartges a "1" in the professional appearance category) and show that Baldwin gave Tolonda Rose the highest overall interview score.

Tolonda Rose was hired as a full-time Assistant Women's Basketball Coach for the 1993–94 season. Since Bartges was earning $12,000 a year as Head Softball Coach, this meant that she could either serve as a volunteer assistant coach for the basketball team or leave the position.[1] Judy Rose met with

---

1. NCAA regulations do allow UNCC to have two full-time assistant coaches and one part-time "restricted earnings" coach, but the restricted earnings coach is limited to $12,000 a year in total compensation from the University; Bartges was already making that amount as Head Softball Coach, so if she had wanted to continue coaching basketball she would have to do so on a volunteer basis again.

Bartges and offered to change the terms and conditions of her employment so that she could qualify for Health Benefits under UNCC's health insurance plan. Bartges agreed to change her appointment from a twelve month to a nine month appointment for that reason because, as she testified in her deposition, she placed a very high premium on health insurance coverage.

Bartges continued in her position as Head Coach of the Women's Softball Team. Bartges' evidence shows that she had some further difficulty concerning the use of University funds. On May 14, 1993, she was told to stop spending money on recruiting because she had exhausted her budget. On June 16, 1993 she received another memorandum from Judy Rose concerning overspending without prior approval. In this memo Rose recounts that Bartges had (incorrectly) told the Business Manager, who was new in the position, that her over-budget expenses could be reimbursed because such expenses were carried over to the next year's budget. Rose informed Bartges that this was not true, and reprimanded her for her "second blatant disregard" for the policy of the Athletic Department.

On November 30, 1993, Bartges filed a second sex discrimination charge with the EEOC. Therein Bartges alleged that she was "removed" from the Assistant Women's Basketball Coach position because she was (1) a woman and (2) she had filed an earlier complaint of sex discrimination. Later, on February 7, 1994, the EEOC sent Bartges a right-to-sue letter with respect to her unequal pay claim. On February 16, 1994 the EEOC issued a letter reflecting its determination that UNCC did not violate Bartges' rights or punish her for filing her earlier EEOC grievance when it hired Tolonda Rose as full-time Assistant Basketball Coach thereby eliminating Bartges' part-time position. The EEOC's February 16, 1994 letter noted that during the period when Bartges' second complaint was filed five coaches (three men and two women) received pay increases. It noted that Bartges was one of the women receiving pay increases because her part-time coaching position was increased from .60 to .75 FTE (full-time em-

ployment) with an increase in pay and benefits for working nine months instead of twelve.

On July 26, 1994, Bartges submitted her resignation to Judy Rose. In her letter, she claimed that she had been treated differently by UNCC and wrongfully reduced to part-time employment after she filed her sex discrimination claim. She said that she found the discrimination against herself and other women at UNCC intolerable, and therefore, she had decided to submit her "involuntary" resignation from the University after her annual leave and vacation had expired. Ms. Rose accepted Ms. Bartges' resignation, categorically denying any charges of sex discrimination.

Bartges filed this suit. In her complaint, Bartges alleged that UNCC had violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), Title VII, 42 U.S.C. § 2000e *et seq.*, Title IX, 20 U.S.C. § 1681 *et seq.*, as well as her Fifth and Fourteenth Amendment Rights, which were asserted *via* an action under 42 U.S.C. § 1983. Bartges also advanced claims under North Carolina law for wrongful discharge in violation of public policy and a violation of N.C.Gen.Stat. § 126–36. UNCC has moved for summary judgment asserting that Bartges has failed to produce evidence from which a reasonable person could find that UNCC violated her rights.

## II. *ANALYSIS.*

■ UNCC has moved for summary judgment pursuant to Fed.R.Civ.Proc. 56, alleging that Bartges has failed to produce evidence from which a reasonable person could conclude that UNCC discriminated against Bartges because of her sex or retaliated against her for filing civil rights grievances. "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) *citing* Fed. R.Civ.Proc. 56(c). However, Rule 56 does not require the moving party to produce

evidence negating an opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. That is, "under *Celotex,* 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case.' " *Cray Communications v. Novatel Cmptr. Systems, Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (*citing* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2720 at 10). This is because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ..." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

▪ "Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 817 (4th Cir.1995) *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and this burden is particularly important where the nonmoving party bears the burden of proof. *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Put another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ..." *Id.* Where, as here, a party moves for summary judgment based on lack of proof as to material facts, "the judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

▪ As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving party." *Austin v. Clark Equipment Co.,* 48 F.3d 833, 835 (1995). But in order for an inference to be *permissible* it must be *reasonable,* and "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in 'light of the competing inferences' to the contrary." *Sylvia,* 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In short, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Fourth Circuit has long applied these well-settled summary judgment principles to claims of unlawful discrimination. For example, in *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230 (4th Cir.1982), the Fourth Circuit applied the burden shifting scheme developed for Title VII claims to those brought under the Age Discrimination in Employment Act of 1967 and emphasized that, consistent with *Anderson, supra,* a plaintiff is obliged to produce "significantly probative" evidence in support of a discrimination claim. The court wrote:

> This emphasis, where causation is dispositive, upon 'probability,' 'reasonable probability' rather than mere 'possibility' ... simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere 'possibilities,' by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v.

*Id.* at 242 (citations omitted); *see also St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (operation of *McDonnell Douglas* burden shifting scheme does not shift the burden of proof in the sense of the risk of nonpersuasion). Thus, the plaintiff must produce significantly probative evidence that the treatment he complains of was the result of discrimination rather than a legitimate non-discriminatory reason. And that legitimate non-discriminatory reason need not be a good reason, it need only be non-discriminatory, for laws prohibiting discrimination do not give this Court the power to sit as a "super personnel council," *see Jiminez v. Mary Washington College,* 57 F.3d 369, 376 (4th Cir.1995), or to second guess the wisdom of business decisions, *see Henson v. Liggett Group, Inc.,* 61 F.3d 270, 277 (4th Cir.1995). With these background principles in mind, this Court now turns to Bartges' claims.

### A. *Equal Pay Act.*

▮ The Equal Pay Act provides that no employer may pay employees of one sex less than he pays employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort and responsibility when performed under similar working conditions. 29 U.S.C. § 206(d). In order to establish a *prima facie* case under the Equal Pay Act, a plaintiff must show that she received lower pay than a male co-employee for performing work substantially equal in skill, effort, and responsibility under similar working conditions. *Strag v. Board of Trustees,* 55 F.3d 943, 948 (4th Cir.1995).[2] Any comparison between male and female employees must be made on an individual basis—factor by factor with the male comparator—and the male comparator must be a particular individual employed by the defendant, not some hypothetical composite male. *Houck v. Virginia Polytechnic Institute,* 10 F.3d 204, 206 (4th Cir.1993). Also, the comparator and plaintiff must perform work that is substantially equal and here "[t]he crucial finding ... is whether the jobs to be compared have a 'common core' of tasks, i.e.,

whether a significant portion of the two jobs is identical," *Brewster v. Barnes,* 788 F.2d 985, 991 (4th Cir.1986), because "[w]hen Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that 'the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other.' " *Jacobs v. College of William and Mary,* 517 F.Supp. 791, 798 (E.D.Va.1980), (quoting *Brennan v. City Stores, Inc.,* 479 F.2d 235 (5th Cir.1973)), *aff'd without opinion,* 661 F.2d 922 (4th Cir.1981). If a significant portion of the jobs is identical, then the equal work inquiry "turns to whether the differing or additional tasks make the work substantially different." *Brewster,* 788 F.2d at 991 (citations and quotations omitted). If a plaintiff makes the *prima facie* showing, then the burden shifts to the employer to prove, by a preponderance of the evidence, that the pay differential is justified by one of the four statutory exceptions set forth in § 206(d)(1). *Strag,* 55 F.3d at 948. These exceptions allow the employer to show that the lesser pay received by the plaintiff results, *inter alia,* from a deferential based on any factor other than sex. 29 U.S.C. § 206(d)(1)(iv).

### 1. *Bartges' Prima Facie Showing.*

▮ The Court finds that Bartges has failed to produce evidence from which a reasonable person could conclude that she received lower pay for performing work substantially equal in skill, effort, responsibility, and working conditions. Bartges served as part-time Head Softball Coach and part-time Assistant Basketball Coach. These positions, when taken together, gave her full-time employment at UNCC. She has alleged that specific male employees, the Head Baseball Coach, the Assistant Men's Basketball Coaches, the Head Volleyball Coach, and the Head Golf Coach, performed substantially equal work under substantially similar conditions. Upon close examination, however, it is apparent that these positions do not require substantially equal skill, effort, and responsi-

---

2. A finding of intentional sex discrimination is not required to sustain liability under the Equal Pay Act under the law of this Circuit. *See Brink-* *ley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 344 n. 17 (4th Cir.1994); *Brewster v. Barnes,* 788 F.2d 985, 993 n. 15 (4th Cir.1986).

bility, or do not have substantially equal working conditions.

Bartges alleges that she did work substantially equal to the Head Baseball Coach. But that coach is responsible for a thirty-two member team as opposed to the fifteen member softball team. Therefore, the Head Baseball Coach must recruit, monitor, and coach more than twice as many student-athletes as Bartges. In addition, the Head Baseball coach is also responsible for supervising one full-time coach. Because that position requires more work, UNCC has made the Head Baseball Coach a full-time position, whereas the Head Softball position that Bartges filled was not a full-time position. Although Bartges did have another part-time position, she has made no showing that her combined responsibilities are the same as that of the Head Basketball Coach. The same is true of the Head Volleyball Coach position, which is also a full-time position. Bartges has made conclusory assertions that she did equal work, but she has failed to produce specific facts that the responsibilities and conditions were similar and she cannot rest on the bare allegations in the complaint and conclusory assertions in her affidavits to withstand a motion for summary judgment. *Strag,* 55 F.3d at 949; *Soble v. University of Maryland,* 778 F.2d 164, 167 (4th Cir.1985).

Likewise, Bartges' attempt to use the Head Golf Coach as a comparator is misplaced. During the time she worked at UNCC, two individuals held the position of Head Golf Coach at UNCC. Until 1992, the part-time Head Golf Coach position was held by Mr. Kerr. During the period in question, Kerr was paid $5,700 for his work as Head Golf Coach whereas Bartges' was paid $12,000 for her Head Coach position, and Kerr also performed work as Director of Intramurals. The same is true with regard to the work of Mr. Draughon, who replaced Kerr as Head Golf Coach. Prior to taking the coaching position, Draughon made $20,298 per year as a full-time assistant ticket manager at the University. When he agreed to take the Head Coaching position, his total salary was increased $5,056 to $25,354. Of this sum, $10,130 was attributed to his coaching duties, presumably because those duties di-

minished the time and work he put towards being an assistant ticket manager, although Bartges has not elucidated this point. In short, Bartges' attempt to compare herself with the Head Golf Coach is unavailing because she has failed to produce evidence which shows that these positions entail comparable work, and she has failed to show how any comparison supports her claims: she was paid more for her coaching work than either Golf Coach.

The final comparison offered by Bartges is with the Assistant Basketball Coaches of the men's team. Bartges was a part-time Assistant Coach of the women's basketball team, whereas the Assistant Coach position for the men's team is a full-time position. In addition, the uncontested evidence is that men's basketball is the most marketable and largest revenue producing sport at UNCC. This makes the position considerably more important to the University, and also means the position entails greater public relations, recruiting and other coaching responsibilities, and means the position carries with it much more pressure to produce winning teams. Other courts have recognized that these differences in responsibility and expectations render the work performed by such coaches different in kind and create different working conditions, and this Court agrees with their analysis. *See Jacobs v. College of William and Mary,* 517 F.Supp. at 795–98 (emphasizing that part-time and full-time coaching positions could not be compared); *Stanley v. University of Southern California,* 13 F.3d 1313, 1321–24 (9th Cir.1994) (difference in public relations, promotional, and revenue generating responsibilities makes work different and justifies higher wage); *Deli v. University of Minnesota,* 863 F.Supp. 958, 961 (D.Minn.1994) (differences in size of team, spectator attendance, revenue generated by sport, and responsibility for public and media relations shows that work is not substantially equal). Bartges' position as part-time Assistant Basketball Coach and part-time Head Softball Coach cannot be compared with the full-time Assistant Basketball Coach's position.

In short, this Court finds that Bartges has failed to produce evidence from which a rea-

sonable person could conclude that she did work substantially equal to the male comparators that she has offered. The Head Coach of the men's baseball team coaches a team twice as large as Bartges' softball team and supervises assistant coaches. Bartges points to the Head Golf Coach, but ignores the other duties performed by these coaches and fails to note that they were paid less than her for their coaching duties. Bartges relies on a comparison with the Head Volleyball Coach but has provided no evidence concerning the specific duties of the coach which allow any comparison, and neglects the fact that the Head Volleyball Coach position is full-time, whereas that of the Head Softball Coach is part-time. She attempts a comparison with the Assistant Basketball Coaches, but she again fails to note that these are full-time positions, whereas her position is part-time, and ignores the significant difference in the sports that are coached.

■■■ Bartges implicitly acknowledges that she cannot show that she was paid less for substantially equal work because she cannot identify a satisfactory male comparator. In an effort to address this flaw in her case, Bartges repeatedly combined her two part-time positions to justify comparison to other full-time positions. In so doing, she has made the very comparisons with hypothetical or composite males that cannot be used to prove a violation of the Equal Pay Act. *See Strag,* 55 F.3d at 948; *Houck,* 10 F.3d at 206. Likewise, her brief and affidavit are filled with general assertions that she worked as hard as anybody, and therefore she should be paid as much as anybody. But such conclusory and general assertions are not the specific facts needed to withstand summary judgment, *see Strag,* 55 F.3d at 949; *Soble,* 778 F.2d at 167, and, at any rate, the inquiry under the Equal Pay Act is whether she received equal pay for substantially equal work, not whether she should be paid more because the work she performed is of comparable worth. *See e.g. EEOC v. Madison Comm. Unit School Dist. No. 12,* 818 F.2d 577, 580, 582 (7th Cir.1987); *Lemons v. City and County of Denver,* 620 F.2d 228, 229 (10th Cir.1980); *Brennan,* 479 F.2d at 238–39.

### 2. *UNCC's Affirmative Defenses.*

Even if Bartges had made her *prima facie* showing, however, summary judgment would still be required because there is no genuine dispute concerning whether the wage paid to Bartges results from factors other than sex within the meaning of 29 U.S.C. § 206(d)(1)(iv) such that the University has not violated the Equal Pay Act. The University has given several reasons why Bartges was paid less than the coaches of other programs: her limited experience, the relative importance of the sport she coached in the University's sports program, and the prevailing wage for coaches in her sport. Any of these reasons establish that UNCC's treatment of Bartges resulted from factors other than sex, and Bartges has failed to create a genuine issue of material fact with respect to any justification.

#### a. *Qualifications.*

■■■ Bartges has alleged that she is entitled to the pay given other coaches. But, as UNCC has shown, Bartges cannot really compare herself in terms of background or experience to any of the coaches she has labeled as her peers. But a comparison of her qualifications with those of her "peers" clearly shows that her qualifications are not at all comparable and confirms the University's assertion that she was offered coaching positions because the University staff liked Bartges and was trying to give her career a boost.

For one thing, when Bartges volunteered to help coach the UNCC women's basketball team in 1988 she had almost no qualifications. She had played basketball in high school but did not play intercollegiate basketball. Her coaching experience was extremely limited: Bartges had been a volunteer Assistant Women's Basketball Coach at Penn State University for the 1986–87 academic year, and she had coached the Tyrone Area High School girl's basketball team during the 1987–88 academic year. When Rose asked Bartges if she wanted to try the Head Softball Coach position, Bartges had almost no experience in that area. She had played softball in high school, and had played slow-

pitch softball during two summers in college, but she had never played any intercollegiate softball, and she had never coached that position. In short, Bartges' coaching and playing experience were extremely limited.

Bartges was much less qualified than the Assistant Basketball Coaches to which she has compared herself. In 1989, when Bartges was first employed by UNCC as Assistant Women's Basketball Coach, there were three Assistant Basketball Coaches for the men's team: Melvin Watkins, David Pendergraft, and Kevin Billerman. Watkins played four years of intercollegiate basketball at UNCC and had joined the UNCC staff as Assistant Basketball Coach in 1978. So Watkins had ten years of coaching experience and was coaching full-time when Bartges began work as a volunteer Assistant Coach in 1988, and 11 years of experience when UNCC began to pay Bartges for her part-time work in 1989–90. Pendergraft had worked two years as a part-time Assistant Basketball Coach at East Carolina University, four years as a full-time assistant in that position, and had worked at UNCC since 1988 when Bartges was employed part-time as an Assistant Coach. The same is true of Billerman who had an outstanding career as an intercollegiate basketball player at Duke University, had played and coached professional basketball in Europe, had eight years of high school basketball coaching experience and had four years of experience at UNCC when Bartges was employed as part-time Assistant Basketball Coach in 1989. These differences in experience, qualifications, and the position (full-time versus part-time), justify the higher salaries that these coaches received.

Similarly, Bartges has nowhere near the experience or qualifications of Head Volleyball Coach to which she has compared herself. In 1990–91, UNCC decided to elevate the part-time Volleyball coaching position to a full-time position in the hopes that it would attract greater popular attention and patronage.[3] UNCC hired James McClellan to fill that position; he was paid $28,522 in 1992–93 and $29,100 in 1993–94. Prior to accepting the position of Head Volleyball Coach at UNCC, McClellan had been Head Volleyball Coach at Bellarmine College and had ten years of head coaching experience at Morehead State University. These are dramatic differences in experience and professional success that easily explain why the wage paid to the full-time Volleyball Coach was greater than that paid to Bartges as part-time Head Softball Coach.

For similar reasons, Bartges' effort to compare herself with the Head Baseball Coaches also fails. Gary Robinson, who was the Head Baseball Coach prior to the 1992–93 season, had ten years of experience coaching for UNCC and had three years of experience as a coach before he came to the University. Robinson's top earnings were $31,330. In 1992, UNCC hired Loren Hibbs as Head Baseball Coach; his salary was $32,000. Prior to coming to UNCC Hibbs had six years of coaching experience at Wichita State University, one of the best college baseball programs in the United States. While Hibbs was coaching at Wichita State, the baseball team had an outstanding record of success at the national level, including a national championship. In contrast to these baseball coaches, Bartges had no experience as a softball coach when she was hired for that position in 1990.

In short, Bartges has utterly failed to produce evidence that creates anything like a genuine issue concerning UNCC's contention that its compensation decisions were based upon the qualifications of its coaches. In response to Bartges' claim of discrimination, the University has produced evidence that UNCC's compensation decisions were based the prior playing and coaching experience of its coaches as well as demonstrable success in the coaching field. The résumés of the coaches selected by Bartges clearly indicate that they were much more qualified.

■ Bartges realizes this for she has failed to provide any reason or evidence that the University's stated reason for its compensation decisions were false. Instead, Bartges continually offers her opinion that her experience and ability are substantially

3. Bartges' brief fails to cite any evidence concerning the Head Volleyball Coach position when it was part-time and this Court declines to comb the record.

equal to that of her proffered comparators.[4] But that is not the point; "[u]nder the Equal Pay Act, the courts and administrative agencies are not permitted to substitute their judgment for the judgment of the employer who has established and applied a *bona fide* job rating system so long as it does not discriminate on the basis of sex." *County of Washington v. Gunther,* 452 U.S. 161, 170–71, 101 S.Ct. 2242, 2248–49, 68 L.Ed.2d 751 (1981) (quotations, ellipses, and brackets omitted), and therefore this Court will not sit to review the University's personnel and business decisions. *Cf. Jiminez,* 57 F.3d at 376; *Henson,* 61 F.3d at 277. While the precise value to be placed on these qualifications is somewhat subjective, "[a]n element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible." *Strag,* 55 F.3d at 949 (quoting *Equal Employment Opportunity Commission v. Aetna Insurance Co.,* 616 F.2d 719 (4th Cir.1980)). Bartges has not produced any evidence tending to show that compensation decisions of Rose are not the result of genuine differences in the qualifications of the applicant, so there is no genuine dispute on this issue. Because UNCC has established that its compensation decisions were based on a factor other than sex within the meaning of 29 U.S.C. § 206(d)(1)(iv), the University is entitled to summary judgment on Bartges' claim under the Equal Pay Act.

### b. *Priority of the Softball Team and Salary Market.*

■ The University has also given other reasons unrelated to sex which entitles it to summary judgment on Bartges' claim. The University has explained that the compensation of coaches for various sports is shaped largely by budgetary constraints: UNCC's Department of Athletics receives no state appropriated funds for its operation, including coaching salaries. Therefore the funding of intercollegiate athletic programs is dependent on student fees, ticket sales and gifts. These budgetary constraints and the need to generate ticket and gift income require Judy Rose, the (female) Athletic Director at UNCC, to prioritize department spending so it can provide students with an opportunity to compete at the college level and allow UNCC to attract students to UNCC.

For these reasons Judy Rose, the (female) Athletic Director for UNCC, places the highest priority on those sports programs which generate the greatest revenue or which UNCC believes will have the greatest long term revenue-generating potential (ticket sales and gifts). Rose also considers whether there is significant community interest in the sport because that interest indicates whether the sport will serve to attract students to UNCC. According to Rose, the sports that received "high priority" treatment prior to 1994 were men's and women's basketball, men's baseball and soccer, and women's volleyball (in 1994 women's soccer was added to the high priority group). The low priority sports were men's and women's track and field and cross-country, men's and women's tennis, men's and women's swimming, and women's softball. UNCC's spending corroborates Rose's assertion because all of the high priority sports have full-time coaches, while none of the low priority sports—men's or women's—have full-time coaches.

UNCC has explained that the salary of the Women's Softball Coach is also shaped, in part, by the employment market. Here, Rose explains that given the Department's finite resources she negotiates to keep salaries as low as possible and, naturally, salaries are shaped by the credentials of applicants and an applicant's ability to command a greater salary from other schools. According to Rose, the salary for the Women's Softball Coach is low, because both Wiseman and Bartges were willing to do the job for that salary and she did not need to pay them more. Rose sees this as saving resources to use for developing UNCC's Athletic Department. Rose's actions with respect to the Golf Coach substantiate UNCC's assertion. When Kerr left as Golf Coach, Rose tried to

---

4. Bartges' brief fails to cite any evidence concerning the qualifications or precise duties of the Head Golf Coaches at UNCC which is understandable because, as the University has pointed out, both coaches were paid less than Bartges.

fill the position with someone outside the University, but could not meet the salary requirements of outside applicants. Rather than meet those salary requirements for golf, a low priority sport, Rose hired Draughon, who worked in UNCC's ticket sales, and was willing to coach for less.

The University has asserted that the low compensation Bartges received as Head Softball Coach reflects the low priority given women's softball, the relatively small amount of resources UNCC has allocated for that sport, and the University's ability to fill the position by offering a relatively low amount of compensation given prevailing wages for this position. Bartges has not really addressed these assertions, except to argue that there is widespread interest in women's softball in North Carolina, so the University's decision not to spend money on the women's softball team is really a result of intentional sex discrimination against women.[5] Bartges' assertion is irrelevant. UNCC has decided to give the women's softball team low priority—which affects the wages paid the coach whether male or female—by reason of factors other than sex: the revenue-generating potential of sports and community interests in those sports, and the prevailing rate for such work. Bartges has not produced any evidence tending to show that those stated reasons are untrue, she just thinks that women's softball could generate income for UNCC, if the University gave the sport a chance. This Court will not second guess the University's business decision, see *Gunther,* 452 U.S. at 170–71, 101 S.Ct. at 2248–49; *cf. Jiminez,* 57 F.3d at 376; *Henson,* 61 F.3d at 277.

## B. *Bartges' Title VII Claims.*

Bartges has also advanced wage discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Although her complaint is not entirely clear, Bartges asserts that UNCC discriminated against her on the basis of sex when: (1) it paid her less than certain male coaches, (2) removed her from the position of Assistant Women's Basketball Coach, (3) changed the Head Softball Coach to a nine, instead of twelve, month position, and (4) denied her additional employment in the academic advising department. Bartges tops this impressive list of allegations off with a claim that UNCC fired her in retaliation for filing her sex discrimination claims with the EEOC, a claim which provides the *leit motif* for her complaint as a whole. For the reasons given below, this Court finds that UNCC is entitled to summary judgment on all of these claims.

### 1. *Title VII Wage Discrimination Claim.*

It is well established that a plaintiff may advance a claim that an employer discriminated on the basis of sex when paying wages without satisfying the "equal work" requirement of the *prima facie* case under the Equal Pay Act. *Gunther,* 452 U.S. at 181, 101 S.Ct. at 2254. Absent direct evidence showing intentional discrimination on the basis of sex, an employee may resort to the burden-shifting method first outlined in *McDonnell Douglas v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994). In the context of a *prima facie* case of sex discrimination under Title VII, this requires a showing of a connection between sex and an adverse employment decision. *Id.* The plaintiff's burden is not onerous, and she may make out a *prima facie* case by showing that she is female, that the job she performed was similar to higher paying jobs occupied by males, that she was paid less for her work. *Id.* If the plaintiff makes the *prima facie* showing, then the employer has the burden of producing a legitimate non-discriminatory motive for its decision. The employer bears only the burden of production on this point; the ultimate burden of persuasion remains

---

5. Bartges' assertion is interesting: when she lodged her complaint with the EEOC she told them that she needed more recruiting money because North Carolina only played slow-pitch softball and she needed to recruit players from out of state. Also, it is undisputed that until 1994–95 North Carolina high schools played only slow-pitch softball and there was no Metro Conference championship for softball until 1994–95. All of this evidence tends to confirm the University's judgment that there is not, at least not as of yet, widespread public interest in women's fast-pitch softball.

with the plaintiff at all times. *Brinkley–Obu,* 36 F.3d at 344. Once the employer produces a legitimate non-discriminatory reason for its decision, the plaintiff has the burden of proving that the employer's stated reason for its decision is a pretext for discrimination. *See St. Mary's Honor Center,* —— U.S. at —— ——, 113 S.Ct. at 2748–49; *Jiminez v. Mary Washington College,* 57 F.3d 369, 377–78 (4th Cir.1995).

▋ Bartges has not produced evidence from which a reasonable person could conclude that UNCC paid her less than males performing similar work, because she was female. As discussed above, Bartges has not even made out her *prima facie* case of discrimination because she has failed to show that she performed work similar to that of the coaches she has selected as comparators in terms of responsibility, pressure, and public relations responsibilities. Even if she had made out her *prima facie* case, she has produced no evidence from which a reasonable person could conclude that UNCC's stated reasons for its decision are a pretext for sex discrimination. UNCC has stated that the low salary paid the women's softball coach reflects the low priority that UNCC places on women's softball given its desire to promote sports that generate revenues which fund the sports programs and place UNCC in the public eye thereby attracting students to UNCC. Further, the University has established that the low salary of the Softball Coach is set by the market, not the sex of the coach, both Bartges, a female, and Wiseman, a male, were paid a small sum for their work, and one must remember, after all, they were simply coaching a softball team on a part-time basis. UNCC has also shown that Bartges has significantly less playing and coaching experience than the coaches to whom she has compared herself, and that the market salary for coaches for her sport is lower than that of other sports. Bartges has not produced evidence which shows the University's stated reasons for paying her a low salary are unworthy of credence, and therefore, UNCC is entitled to summary judgment on this claim.

Bartges inexplicitly recognizes her lack of evidence. Instead of addressing the University's stated reasons for its decision, Bartges repeatedly asserts that UNCC must be discriminating against women coaches because women coaches, on a whole, are paid less than men coaches on a whole. Bartges' gross over-generalization is incredible because it neglects the obvious differences between the experience and qualifications of coaches and the sports coached, and it conveniently ignores the fact that some men coaches are paid less than some female coaches. It also ignores the fact that coaches' salaries are driven, at least in part, by what the University is willing to invest in a given sport; for example, the well-qualified male coach of the women's volleyball team is paid much less than the male coach of the men's basketball team. Finally, it ignores the University's contention that coaches' salaries are largely set by the market for such talent; both Bartges (a woman) and Wiseman (a man) were paid a low salary because they were willing to work for it. Given these facts, Bartges' general claim that her wage, and that of other coaches, was determined by sex, not other factors, is untenable. Such gross over-generalizations can never substitute for the specific and significantly probative facts needed to withstand a motion for summary judgment.

### 2. *Title VII Promotion, Demotion, and Hiring Claims.*

Bartges has also claimed that UNCC discriminated against her on the basis of sex when it failed to hire her for the full-time Assistant Women's Basketball Coach position, reduced her position from a full-time (12 Month) to a part-time (9 month) position, and failed to hire her in the position of academic advisor. All of these claims are treated under the burden shifting method outlined in *McDonnell, supra,* and none of these claims has merit.

▋ Bartges' first claim is that UNCC discriminated against her on the basis of sex when it hired Tolonda Rose for the position. But Bartges' claim that Judy Rose, a woman, discriminated against Bartges because she was a woman, by hiring Tolonda Rose, another woman, is ridiculous. Bartges has not even made out a *prima facie* case on these facts because she cannot show that she did

not get the job under circumstances that give rise to a reasonable inference of discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994).

■ Bartges' claim that UNCC discriminated against her on the basis of sex when it failed to hire her as an academic advisor is likewise meritless. She states that after Tolonda Rose became the full-time Assistant Women's Basketball Coach she "inquired" about a position in academic advising, although there is no evidence in the record that a position was open at the time she made inquiries. Ms. Lisa Helms told Bartges that the Academic Advising Department had decided not to employ coaches as academic advisors. In her deposition, Bartges admitted there were good reasons for such a policy and, more importantly, she has failed to produce any evidence that such a policy decision had not been made by the Academic Advising Department. In short, Bartges has failed to produce evidence that there was a position available in the Academic Advising Department, that she formally applied for the job, or that a male was hired instead of her. Under these circumstances Bartges has failed to produce evidence from which a reasonable person could find that she established a *prima facie* case of sex discrimination, or that UNCC's stated reasons for not hiring Bartges as an academic advisor were not worthy of credence.

■ Bartges' claim that UNCC discriminated against her on the basis of sex when it changed her full-time (12 month) position as Head Women's Softball Coach to a part-time (9 month) position is also untenable when examined in context. The record shows that Bartges first began work at UNCC as part-time Assistant Basketball Coach and later she became Head Softball Coach, another part-time position. By virtue of these two part-time positions, Bartges became a full-time employee of the University.

Subsequently, Rose decided to upgrade Bartges' position to a full-time position. After the job search was completed and Tolonda Rose was hired for the full-time position, the part-time position occupied by Bartges ceased to exist.[6] As a result, Bartges was left with her position as Head Softball Coach, a part-time position. Under UNCC's employment policies, Bartges was no longer entitled to certain health benefits.

For this reason, Judy Rose met with Bartges and asked her whether she would like the Head Softball Coach position to be treated as a twelve or nine month appointment under the University's policy manual. Rose explained that treating the position as a nine month appointment would mean that Bartges could still receive health insurance benefits. After considering these options, Bartges agreed to have the position treated as a nine month position. Thus, the only reason Bartges' position was changed from a full-time (12 month) to a part-time (9 month) position was so she could receive more compensation, in the form of benefits, from UNCC. This Court agrees with the EEOC which noted that this reclassification of her position amounted to a promotion when it determined that Bartges did not state a claim for sex discrimination when she was not made Assistant Women's Basketball Coach. Under these circumstances, Bartges has failed to establish a *prima facie* case because she cannot show that this change in her position was actually an adverse employment action. Further, she has certainly failed to produce evidence from which a reasonable person could conclude that the stated reason for the University's decision is a pretext for intentional sex discrimination. Therefore, UNCC is entitled to summary judgment on this claim.

### 3. *Title VII Retaliation Claim.*

Bartges also alleges that UNCC retaliated against her for filing EEOC charges when it failed to promote her to the position of full-time Assistant Women's Basketball Coach and failed to hire her as an academic advisor. In addition, Bartges also appears to allege that the conditions of her employment were unbearable such that she was constructively

---

**6.** As noted earlier, NCAA regulations would permit UNCC to pay one "restricted earnings coach" not more than $12,000 to work as a part-time assistant for the women's basketball team. So even if UNCC had decided to keep that position on the payroll, Bartges was not eligible for this position because she was already making $12,000 for her work as Softball Coach.

discharged, although the only clue that she's advanced this claim is her occasional reference to constructive discharge. Here again, however, Bartges' complaint is long on legal theories, but painfully short on facts.

 Bartges' first claim is that UNCC retaliated against her when it failed to hire her as the full-time Assistant Women's Basketball Coach. Typically, an employee alleging retaliation in violation of Title VII, 42 U.S.C. § 2000e–3(a) must establish a *prima facie* case by showing that: (1) the employee engaged in protected activity, (2) the employer took adverse employment action against the employee, and (3) there is a causal connection between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). In addition, since Bartges alleges a retaliatory failure to promote, Bartges must also show that she applied for the position in question and was qualified for the promotion with respect to those claims. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994).

Even assuming that Bartges made out her *prima facie* case, she has not produced evidence from which a reasonable person could conclude that she did not receive the full-time assistant coach position because she filed a discrimination claim with the EEOC. First, it must be remembered that Bartges was invited to apply for the position by Baldwin and Rose. Initially, Bartges was reluctant to apply, apparently because she was unsure whether she wanted to stay at UNCC. Also, Bartges was one of the three finalists for the job.

But more importantly, Bartges has not produced any evidence that UNCC's stated reasons for its decision to hire Tolonda Rose are a pretext for retaliation. According to Baldwin, he selected Tolonda Rose because she had three years of head coaching experience at Barber Scotia College; she had been a member of the women's basketball team for four years at UNCC and had graduated from UNCC; she understood the program and agreed with Baldwin's coaching philosophy; she was extremely enthusiastic about the opportunity to coach at her *alma mater;*

she had good interpersonal skills; and she presented a good, professional image.

Judy Rose and Colone also recommended Tolonda Rose for the Assistant Coach position. According to Colone, going into the interview he was impressed by the good academic performance of the athletes Bartges worked with; but after the interview he had an unfavorable opinion about Bartges because she wore casual attire to the interview (shorts and a short-sleeved polo shirt) and when he asked her why she wanted the job Bartges told him that she needed the money. This gave Colone the impression that Bartges was motivated by the income, not success. The scores that Baldwin gave the applicants immediately after their interviews confirm Colone's testimony in part (on an ascending scale from 1–5 Baldwin gave Bartges a "1" in the professional appearance category) and show that Baldwin gave Tolonda Rose the highest overall interview score. Bartges' own testimony confirms that of Rose, Baldwin, and Colone, and shows that one need look no further than UNCC's stated reasons for its action to account for the hiring of Rose. According to Bartges, when Rose asked her whether she preferred coaching softball or basketball, Bartges told her she thought the question was unfair and refused to answer it. Bartges says she did not answer the question, because she thought Rose was trying to find a reason to fire her as softball coach. Once Bartges' speculation is set aside, it is easy to see how her failure to reply would hardly create a good impression. Further, Bartges readily admits that she under-dressed for the job interview and this was a "mistake" on her part. Finally, Bartges recounts that she knew she would not get the job when she heard that Tolonda Rose was a candidate, because she knew that Baldwin would want to hire Tolonda. According to Bartges, when Baldwin told her that Tolonda received the job, she "laughed in his face, literally . . . I was just—I laughed right at him." In her deposition, Bartges says that she laughed in Baldwin's face upon receiving her bad news, because she knew Baldwin would hire Tolonda Rose, a star player on Baldwin's first team.

Bartges was right; but her certainty that Baldwin would hire Tolonda Rose just highlights her failure of proof. At best Bartges has shown that Baldwin preferred Tolonda Rose, a star player on his first team. Such preferences are an entirely acceptable basis for his decision especially where, as here, there are demonstrable reasons for the decision; *i.e.,* Tolonda Rose's superior experience as a player and coach of women's basketball. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452 at 456–57 (4th Cir.1989); *Strag,* 55 F.3d at 943. Because Bartges has failed to produce any significantly probative evidence that the University's stated reasons for hiring Tolonda Rose as Assistant Basketball Coach are unworthy of credence, Bartges has failed to produce evidence from which a reasonable person could conclude that there was a causal connection between UNCC's hiring of Tolonda Rose and Bartges' protected activity. Therefore, UNCC is entitled to summary judgment on this claim.

Thus, Bartges has not produced any significantly probative evidence that UNCC's stated reasons for hiring Tolonda Rose are a pretext for retaliation against her, except the fact that Tolonda Rose was hired after Bartges filed a complaint with the EEOC, and her own conclusory accusations of retaliation. Bartges' bare assertions, without more, are not enough to withstand a motion for summary judgment, *See Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980) (plaintiff's contention that she was better qualified is not entitled to any weight); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456–57 (4th Cir. 1989) (assertions of discrimination are not enough to withstand substantial evidence of legitimate reasons for employer's action); and a mere showing that an employer knew of a complaint when it took an employment action is not enough to show retaliation. *See Hughes v. Bedsole,* 48 F.3d 1376, 1387 (4th Cir.1995) (*citing Wagner v. Wheeler,* 13 F.3d 86, 91 (4th Cir.1993), "Temporal proximity . . . is simply too slender a reed on which to rest a Section 1983 retaliatory discharge claim.").

■ Bartges also appears to argue that UNCC was retaliating against her when it reduced her full-time Head Softball Coach position from full-time (12 Month) to part-time (9 month) position. But for the reasons given earlier, that claim is untenable. Like the EEOC, this Court finds that this adjustment, when considered in context, cannot be regarded as an adverse employment action. Bartges actually chose this option in order to secure benefits that she would not be eligible for under the University's health plan. Giving Bartges more benefits is not retaliation.

■ Likewise, Bartges' claim that UNCC was retaliating against her for filing a complaint with the EEOC when it failed to hire her in the position of academic advisor is also untenable on the record before the Court. Bartges has not shown that such a position was available, or that the University's stated reason for not giving her the position—its decision not to hire coaches as academic advisors—was a pretext.

■ That brings us to the last of Bartges' Title VII claims. Here, Bartges appears to argue that when UNCC made the second Assistant Women's Basketball Coach position a full-time position, but did not give her the job, UNCC committed what amounts to a constructive retaliatory discharge. Apparently, Bartges believes that after she lost the part-time Assistant Basketball Coach position and was left with the part-time Head Softball Coach position, her working conditions were intolerable. But Bartges' claim must fail, because "[a] constructive discharge occurs when an employer creates intolerable working conditions in a deliberate effort to force the employee to resign." *Carter,* 33 F.3d at 459. Thus, an employee must show that the conditions of employment are harsher than those faced by other employees. *Carter,* 33 F.3d at 459; *EEOC v. Clay Printing Co.,* 955 F.2d 936, 945 (4th Cir.1992). In this case, Bartges was holding the exact same part-time position that she had agreed to accept in 1990, when coach Wiseman resigned. Not surprisingly, then, Bartges has not made any showing that her working conditions were intolerable or, more importantly, that UNCC *deliberately* created working conditions that were designed to force her out of the job. In fact, as the EEOC noted, the only changes made to her position after her part-time Assistant Basketball Coach po-

sition was eliminated was an effort to increase the benefits she received for that work. Indeed, Bartges had initially acted as part-time Assistant basketball Coach *for no compensation,* and had later worked in that position for $4,700, before she was offered and accepted the part-time Head Softball Coach position in 1990, when Wiseman resigned. Absent some evidence of a significant change in the terms and conditions of her employment as part-time Head Softball Coach, Bartges cannot claim that the position she was glad to take in 1990 amounted to a constructive discharge, and she certainly cannot show that UNCC deliberately made the terms of that position intolerable so that she would be forced to quit.

Bartges appears to claim that the mere upgrading of her position to a full-time position was some form of retaliation. Obviously, if she had received the position she would not be making this claim; this shows that Bartges' harm, if any, must flow from her failure to get the upgraded position, and her claim that this was retaliatory fails for the reasons given above. In addition, UNCC agreed to upgrade Bartges' position to a full-time position at least in part at the prompting of the EEOC, and for this reason alone Bartges' claim that UNCC upgraded the position to displace her is untenable.

### C. *Bartges' Title IX Discrimination Claim.*

 Bartges has also advanced her claims under the rubric of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–1688. Relying on *Lakoski v. James, et al.,* 66 F.3d 751 (5th Cir.1995). The Defendant has argued that Bartges cannot state a claim for employment discrimination under § 1681. And if this were a case of first impression, this Court would find that position persuasive; it does seem highly unlikely that Congress intended to create a new cause of action for employment discrimination, without many of the procedural and substantive limitations of Title VII, by means of Title IX. *See Lakoski, supra; Wedding v. University of Toledo,* 862 F.Supp. 201 (N.D.Ohio 1994); *Storey v. Bd. of Regents of University of WI System,* 604 F.Supp. 1200

(W.D.Wisc.1985). However, the Defendant's argument must be rejected. In *Preston v. Com. of Va. ex rel. New River Community Coll.,* 31 F.3d 203 (4th Cir.1994), the Fourth Circuit held that the implied right of action that exists under Title IX extends to employment discrimination on the basis of gender and includes a retaliation claim, *id.* at 205–06, and that principles governing Title VII actions provide standards that shape the contours of the private right of action under Title IX. *Id.* at 207; *cf. Beardsley v. Webb,* 30 F.3d 524, 526–27 (4th Cir.1994) (Title VII was not exclusive remedy for claims of employment discrimination by public employees notwithstanding 1991 amendments, and using Title VII standards to govern discrimination claims under § 1983). Thus, Bartges can proceed under Title IX. Nonetheless, her claim fails precisely because Title VII should provide the standards that flesh out the implied right of action under Title IX, at least for employment discrimination claims. Otherwise the elaborate structure created by Title VII would be undermined as to employment discrimination claims within the scope of Title X. Bartges has failed to produce evidence from which a reasonable person could conclude that UNCC's stated reasons for the employment decisions at issue were unworthy of credence and therefore a pretext for sex discrimination. Thus, UNCC is entitled to summary judgment on Bartges' Title IX claims.

### D. *Bartges' Federal Constitutional Claims.*

 In addition to her claims based upon the federal statutes discussed above, Bartges has advanced claims under 42 U.S.C. § 1983 alleging violations of her constitutional rights to due process and equal protection. These claims are easily dispensed with for several reasons. First, UNCC is not a person within the meaning of § 1983, *see Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989); *Kaimowitz v. Board of Trustees of U. of Illinois,* 951 F.2d 765, 767 (7th Cir.1991); *see also Huang v. Board of Governors of University of N.C.,* 902 F.2d 1134, 1139 n. 6 (4th Cir.1990), and further, UNCC is immune from suit from damages by reason of the

Eleventh Amendment. *See Huang*, 902 F.2d at 1138–39. In her response Bartges does not address this point, except to rely on footnote 10 of *Will, supra*, to claim that she is entitled to injunctive relief. Assuming Bartges is correct on this point, which is by no means clear, *see Will*, 491 U.S. at 64 n. 5, 109 S.Ct. at 2309 n. 5, her claim still fails because the principles governing Title VII actions apply to actions under § 1983, *see Beardsley*, 30 F.3d at 529, and for the reasons given earlier this Court finds that UNCC is entitled to summary judgment on Bartges' claims.[7] Likewise, Bartges' claim that she was retaliated against for her speech as a matter of public concern must fail; for the reasons given earlier she has produced no significantly probative evidence that she was retaliated against, and therefore, she cannot show that but for her speech UNCC would not have made the decisions she challenges. *See Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1071 (4th Cir.1993). Finally, Bartges' claim that UNCC's actions deprived her of due process is also untenable. The only evidence of her arrangement with UNCC indicates that she was an at-will employee who therefore had no property interest entitled to due process protection, *see Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[8]

### E. *Bartges' State–Law Claims.*

Bartges has also alleged that UNCC violated "North Carolina's Employment Discrimination Statute" and apparently she is

referencing N.C.Gen.Stat. §§ 126–36 and §§ 143–422.2; she also offers some half-baked estoppel theory of employment which finds no support in the record. Bartges has no claim under N.C.Gen.Stat. §§ 126–36, because instructional staff of UNCC are specifically excepted from coverage under N.C.Gen. Stat. § 126–5(c1)(8). To the extent Bartges relies upon the other state-law claims for damages, the Eleventh Amendment bars those pendent state-law claims, *see Huang*, 902 F.2d at 1138–39, citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and to the extent she seeks some form of equitable prospective relief pursuant to these claims, the Court finds that UNCC is entitled to summary judgment on the estoppel claim because it finds no support in the record, is patently unreasonable since her contract specifically indicates that she is an at-will employee, and utterly neglects the fact that she resigned from her position at UNCC—she was not fired.[9] Finally, to the extent Bartges seeks relief not barred by the Eleventh Amendment pursuant to N.C.Gen.Stat. § 143–422.2, that claim fails for the same reasons her Title VII claims must fail. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383–85 (4th Cir.1995).

### III. *CONCLUSION.*

Ellyn Bartges volunteered to be an Assistant Coach for UNCC's Women's Basketball team. Bartges did well and Judy Rose, UNCC's (female) Athletic Director, decided to pay Bartges for her work in that part-time

---

7. Bartges' brief is exceedingly unclear. At some points it seems that she rests her claim directly on the Fourteenth Amendment, something that appears impossible under the law of this Circuit. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n. 6 (4th Cir.1995). Even if she could, those claims are, with exceptions addressed above, identical to her claims under Title VII, would be treated accordingly, *see Beardsley*, 30 F.3d at 529, and would fail on the merits for the reasons given earlier. Further, it appears such claims would be barred by the Eleventh Amendment, *see Townsend v. Edelman*, 518 F.2d 116 (7th Cir.1975); *Jagnandan v. Giles*, 538 F.2d 1166 (5th Cir.1976).

8. Again, Bartges does not respond to this point in her brief except to argue that her "employment was not terminable at the discriminatory will of the University or its agents." But this assertion

merely repeats Bartges' claims that she was discharged because of her sex in violation of federal or North Carolina law. The federal claims have been addressed above, the state-law claims are addressed below.

9. Bartges claims it was her understanding that she would have a full-time position at UNCC, but she gives no basis for that understanding and points to no evidence of any such arrangement. Such conclusory assertions are not the specific facts needed to withstand a motion for summary judgment and, even if they were, this Court would grant summary judgment for UNCC on this claim because Bartges' assertion that she was promised full-time employment at UNCC is utterly at odds with her at-will terms of her written contract.

**1334**

position. Later Rose offered Bartges an opportunity to become the Head Coach of UNCC's Women's Softball team. Bartges, a woman, replaced Wiseman, the male coach of that softball team, and she was paid as much or more than Wiseman for her work in this part-time position. In the interim, Bartges had a run-in with Rose for unauthorized fund-raising, and days later she filed a claim with the EEOC alleging that Rose paid her less because she was a woman. Later, UNCC decided to hire a second full-time Assistant Coach for the Women's Basketball team. Although Bartges was a finalist for the position, Tolonda Rose, a woman, got the job. Subsequently, Bartges decided she was not being paid enough for her work as Head Softball Coach and she resigned.

Bartges brought suit alleging violations of the Equal Pay Act, federal discrimination statutes, North Carolina laws, and the Constitution. But there is no genuine dispute of material fact concerning whether Bartges' salary was determined by factors other than sex, and Bartges has failed to produce evidence from which a reasonable person could conclude that UNCC's stated reasons for the decisions Bartges challenges are unworthy of credence and therefore a pretext for sex discrimination. For all of these reasons, UNCC is entitled to summary judgment on Bartges' claims.

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment (document # 15) be, and hereby is, *GRANTED.*

A Judgment will be filed simultaneously with this Memorandum of Decision and Order.