Karen **WEAVER**, Plaintiff,

v.

The **OHIO STATE UNIVERSITY,** et al., Defendants.

No. C2–96–1199.

United States District Court, S.D. Ohio, Eastern Division.

Sept. 30, 1998.

Affirmed, 194 F.3d 1315.

---

D. Wesley Newhouse, II, Lane, Alton & Horst, Columbus, OH, for plaintiff.

Mary Ellen Fairfield, Vorys, Sater, Seymour & Pease, Columbus, OH, for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

This is an employment discrimination action filed by plaintiff, Karen Weaver, against her former employer, The Ohio State University ("OSU"). Andy Geiger, Director of Athletics at OSU, and Archie Griffin, Associate Director of Athletics, are also named as defendants in their official capacities.

In her amended complaint filed on September 16, 1997, the plaintiff asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1983, and the Equal Pay Act, 29 U.S.C. 206(d).

Plaintiff alleges that she was terminated from her position as head coach of the OSU women's field hockey team on May 2, 1996 due to her gender. Plaintiff alleges that she was terminated in retaliation for complaints which she made concerning the condition of the artificial turf at the athletic field on which her team practiced, and for complaints of gender discrimination which she made to members of the National Collegiate Athletic Association ("NCAA") Peer Review Committee on April 29, 1996. Plaintiff further alleges that the defendants, in terminating her employment, treated her differently than male coaches, specifically Randy Ayers, then coach of the OSU men's basketball team, who was allegedly afforded greater tolerance for his team members' disciplinary problems. Plaintiff also contends that she was not offered another position within the OSU Athletic Department upon her termination, unlike Jerry Welsh, the men's hockey coach.

Plaintiff further alleges that OSU violated Title IX by delaying in replacing the turf in the field hockey facility, by failing to timely submit paperwork to the NCAA in 1994 to enable OSU to host the NCAA playoffs, and by offering multi-year contracts only to coaches of high profile sports, while offering only yearly contracts to coaches of minor sports.

Plaintiff also contends that she was not paid as much as the coach of the men's ice

hockey team, who allegedly occupied a position comparable to her job as coach of the women's field hockey team, and that OSU thereby violated the Equal Pay Act.

This matter is before the court on the defendants' motion for summary judgment.

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

Plaintiff has asserted claims of employment discrimination under Title VII, Title IX and § 1983. In a Title VII case, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by the defendant. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A Title VII claimant may establish a prima facie case by credible direct evidence of intentional discrimination, or by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The circumstantial evidence approach requires a showing by the plaintiff that: 1) she is a member of a protected class; 2) she was qualified for the job; 3) she suffered an adverse employment decision; and 4) she was treated differently than similarly situated non-minorities. *Thurman v. Yellow Freight Sys-*

*tems, Inc.,* 90 F.3d 1160, 1166 (6th Cir. 1996).

When plaintiff has met her burden of production and established a prima facie case of discrimination, the burden of production shifts to the defendants to establish a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. If the defendants satisfy this burden, the presumption raised by plaintiff's prima facie case is rebutted. *Thurman,* 90 F.3d at 1166. The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of sex. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff can prove discrimination either: 1) by showing that a discriminatory reason more likely motivated the employer; or 2) by showing that the employer's explanation is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

The *McDonnell Douglas* framework applies to employment discrimination claims brought under § 1983. *Boutros v. Canton Regional Transit Auth.,* 997 F.2d 198 (6th Cir.1993). The Title VII standards for proving discriminatory treatment also apply to claims of employment discrimination brought under Title IX. *See Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.,* 103 F.3d 495 (6th Cir. 1996); *Johnson v. Baptist Medical Center,* 97 F.3d 1070 (8th Cir.1996); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir.1995).

■ Plaintiff alleges that her discharge was the product of sex discrimination. However, plaintiff has produced no direct evidence of discriminatory motive on the part of the defendants, nor has she met her burden of producing evidence sufficient to satisfy all of the elements of a prima facie case of discriminatory discharge in light of the fact that the person who was hired to replace her is also a woman. Defendants are entitled to summary judgment on plaintiff's claims of discriminatory discharge.

■ Plaintiff also alleges that she was discharged in retaliation for engaging in protected conduct under Title VII and Title IX. To prove a prima facie case of retaliation, the plaintiff must show: 1) that she engaged in protected opposition to Title VII or Title IX discrimination or participated in a Title VII or Title IX proceeding; 2) that plaintiff's exercise of her protected rights was known to the defendants; 3) that she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and 4) that there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990) Once the plaintiff has established a prima facie case, the burden of production shifts to the defendants to articulate legitimate nondiscriminatory reasons for the adverse action. *St. Mary's Honor Center,* 509 U.S. at 506–507, 113 S.Ct. 2742. The burden then shifts to the plaintiff to prove that these articulated reasons are a pretext for discrimination. *Id.* at 515, 113 S.Ct. 2742.

■ In regard to the first element, plaintiff is not required to show that she engaged in formal proceedings under Title VII. Rather, an informal complaint to an employer concerning practices which are prohibited by Title VII is sufficient to constitute protected activity. *E.E.O.C. v. Romeo Community Schools,* 976 F.2d 985, 989 (6th Cir.1992).

■ Plaintiff first contends that her discharge was in retaliation for her complaints concerning the condition of the practice field on which the field hockey team played. However, there is no evidence that plaintiff ever framed her complaints concerning the field in terms of Title IX sex discrimination. Complaints concerning unfair treatment in general which do not specifically address discrimi-

nation are insufficient to constitute protected activity. *Cf. Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701 (3d Cir.1995)(complaint about unfair treatment which did not mention age discrimination not protected conduct). Defendants also note that a Title IX complaint would have been unfounded in light of the fact that the men's lacrosse team also used the same practice field.

Defendants have also produced evidence refuting plaintiff's contention that they viewed plaintiff's comments concerning the field with disfavor. Rather, In response to plaintiff's complaints concerning the condition of the field in the spring of 1994, defendant Geiger ordered that the field be tested. Geiger Affid., Para. 5. The artificial turf was tested, and was found to be aged but performing within acceptable parameters. *Id.* Defendant Geiger agreed with plaintiff that the field should be replaced as soon as possible. *Id.*, Para. 6. In June of 1995, he sent a letter to plaintiff in response to her suggestion for naming the field after former Associate Athletic Director Phyllis Bailey, noting that it "is important to replace the turf soon and the name of the field could be a lure for a gift to fund the project." Geiger Affid., Ex. B. The turf was replaced in the summer of 1996 when funds became available. Geiger Affid., Para. 7. According to defendant Geiger, the decision and timing of the replacement of the turf had nothing to do with plaintiff's gender or the gender of the teams which used the field. *Id.* Plaintiff has produced no evidence which would establish a causal connection between her complaints concerning the artificial turf and her termination.

Plaintiff also contends that she was terminated in retaliation for her comments concerning OSU's Title IX compliance to the NCAA Peer Review Committee in April of 1996. Defendants have produced evidence that the plaintiff's comments to the committee members were confidential and that they had no knowledge of the nature of her comments. Geiger Affid.,

Para. 10. The defendants have offered the affidavits of Ann A. Baer and Thomas F. Perry, the committee members who interviewed the plaintiff. Defendants' Motion for Summary Judgment, Exs. 5 and 6. They state that at no time did they disclose any of the information provided by the plaintiff to any member of the OSU Athletic Department. Defendant Geiger also states in his affidavit that at the time plaintiff spoke to the committee members, he had already decided to terminate plaintiff's employment. Geiger Affid., Para. 10. Plaintiff has proffered no evidence, aside from her own unsupported conclusions in her affidavit, indicating that the defendants had knowledge of any statements she made to the committee members. *See Hartsel v. Keys*, 87 F.3d 795, 801, 803 (6th Cir.1996)(conclusory statements, subjective beliefs or intuition not sufficient to support discrimination claim); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir.1996)(conclusory allegations and subjective beliefs insufficient to establish a claim of discrimination).

Plaintiff bears the burden to produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had charges of discrimination not been made. *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990); *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 377 (6th Cir.1984). Plaintiff notes that her employment was terminated within a few days after her meeting with the committee members. A causal connection between complaints of discrimination and an adverse employment action may be shown by direct evidence or by evidence of the employer's knowledge of the complaints coupled with a closeness in time sufficient to create an inference of causation. *Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir.1987). However, temporal proximity between the complaints and the employment action alone is usually not sufficient to support an inference of retaliatory discrimination in the absence of other evi-

dence. *See Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir. 1986)(mere fact that discharge occurred four months after filing of discrimination claim insufficient to support inference of retaliation. Here, plaintiff has produced no evidence to rebut defendants' denial that they had any knowledge of the nature of her complaints to the NCAA committee members. Plaintiff has failed to produce evidence sufficient to raise a genuine issue of material fact as to the existence of a causal connection between her comments to the NCAA Peer Review Committee and her termination.

Defendants have proffered evidence of a legitimate, nondiscriminatory reason for plaintiff's termination. Defendant Geiger stated at paragraph 8 of his affidavit that he terminated plaintiff's employment due to the complaints of the field hockey team members concerning plaintiff's competence he received beginning in late 1995. He indicated that he felt that the team members had lost confidence in the plaintiff, that the situation was irreparable, and that a change was needed. *Id.* He stated that plaintiff's gender and her complaints about the field played no part in his decision not to reappoint her. *Id.,* Para. 7.

Defendant Griffin, plaintiff's immediate supervisor, stated in paragraph 3 of his affidavit that throughout the winter and spring of 1995–1996, a large number of the hockey team members complained to him about plaintiff's coaching abilities and the direction of the field hockey program. A meeting with team members was held on February 15, 1996, during which confidence and trust issues and the tension at practices were discussed. Griffin Affid., Para. 4, Ex. A. Another meeting was held on April 19, 1996, at which team players reported that practice was a joke, that they had no respect for plaintiff as a coach, that there was a lack of motivation and trust, that plaintiff would tell then that something needed to be corrected but could not tell them how to do it correctly, and that they felt that plaintiff could not

take the team to the next level. *Id.,* Para. 5, Ex. B. Defendant Griffin understood that the situation between plaintiff and the team had worsened. *Id.,* Para. 6. The team members related that it was a chore to go to practices, that they had no respect for plaintiff as a coach, and that they dreaded having to participate on the team. *Id.* Defendant Griffin stated that plaintiff's gender and any complaints she may have made were not a factor in his decision to recommend her termination.

Defendants have also submitted the affidavit of Cori Buck, who was a field hockey player from 1992 to 1996, during plaintiff's tenure as coach. She stated that during the 1992–1993 season, she was dissatisfied with plaintiff's performance as coach, and felt that plaintiff did not interact with the players, did not participate in drills, and could not coach. Buck Affid., Para. 3. She indicated that during her sophomore year, two players who were unhappy with the plaintiff left the team. *Id.* Ms. Buck further stated that there was an improvement in the program during her junior year, as two new assistant coaches brought new ideas to the team. *Id.,* Para. 4. However, during her senior year, plaintiff's coaching style reverted to her previous practices; plaintiff seemed distracted and did not provide feedback or guidance to the players. *Id.,* Para. 5.

In the fall of 1995, Ms. Buck approached defendant Geiger and related her concerns about plaintiff's coaching abilities and her lack of ability to take the team to the next level of play. *Id.,* Para. 6. Ms. Buck was disappointed with plaintiff's knowledge of the game and felt plaintiff did not have knowledge of skills necessary to perform at a higher level of competition. *Id.* Ms. Buck expressed her concerns about low team morale. *Id.* She knew of at least six other players who expressed similar concerns to defendants Geiger and Griffin during the fall of 1995 and winter of 1996. *Id.,* Para. 7. She attended a team meeting with defendants Geiger and Griffin, plaintiff, and Assistant Coach Diane Monkiew-

icz on January 4, 1996 to talk about player complaints. *Id.*, Para. 8. A couple of weeks after the meeting, plaintiff halted practice and demanded a statement from the team as to whether they wanted her to continue as coach, and cancelled further practices pending their response. *Id.*, Para. 9. The team members prepared a statement, drafted by Ms. Buck, which is included as Exhibit A to Ms. Buck's affidavit. The team members unanimously indicated their agreement with this statement. *Id.*, Para. 11. In the statement, the team told plaintiff that they did not want her to continue as their coach, and that they felt that she lacked the knowledge necessary to take the team to the next level of play. *Id.*, Para. 12. They further told her that she lacked motivation, that the team did not respect her as a coach, and that they learned more from the assistant coaches. *Id.* According to Ms. Buck, plaintiff ignored their statements, and indicated that she had been going through some personal problems and had not been there 100%. *Id.*, Para. 13.

Ms. Buck further stated in her affidavit, paragraph 14, that in February or March, she and other players attended another meeting with defendant Griffin, at which they gave him a copy of the team statement. Defendant Griffin asked questions to ascertain whether their complaints concerning the plaintiff were based on professional rather than personal reasons. *Id.* Ms. Buck later met with Mr. Griffin to reiterate her concerns and to let him know that the situation had worsened. *Id.*, Para. 15. She agreed with the decision to terminate plaintiff's employment as head coach, and felt that the players could not continue to perform under plaintiff's leadership. *Id.*, Para. 16.

Defendants have produced evidence in support of a legitimate, nondiscriminatory reason for plaintiff's termination. Plaintiff claims that the stated reason is pretextual. Plaintiff has submitted her employment evaluations from May of 1994 and 1995, which contain favorable comments. Plain-

tiff's Memorandum Contra, Exhibits C and D. However, these evaluations predate the late fall of 1995, when the players started making complaints about plaintiff's performance to defendants Geiger and Griffin.

Plaintiff has also presented evidence concerning the performance record of the field hockey team and the good academic record of the players, which she contends were better than those of the men's ice hockey and basketball teams. However, the fact that the field hockey players were good students has little or no relevancy to the issue of the adequacy of plaintiff's coaching skills. The fact that the field hockey team won games does not necessarily establish that it did so because of plaintiff's coaching skills as opposed to the talent of the players, nor does it refute the evidence that the players were dissatisfied with plaintiff's coaching abilities and with her manner of relating to the players, and voiced their complaints to defendants Geiger and Griffin.

Plaintiff also disputes the seriousness of the players' complaints. However, the significance which the defendants attached to the players' complaints was a matter within the business judgment of the defendants. The defendants' reason for terminating plaintiff's employment need not be a good reason, but rather only a nondiscriminatory reason. *See Hartsel*, 87 F.3d at 800 (poor business decision not proof of pretext unless it is so lacking in merit as to call into question its genuineness); *Wilkins v. Eaton Corp.*, 790 F.2d 515 (6th Cir.1986)(court in discrimination action may not focus on soundness of employer's business judgment). The evidence in the record is not sufficient to raise a jury issue as to the genuineness of defendants' reliance on the complaints of the players in terminating the plaintiff. Plaintiff has not produced evidence sufficient to create a genuine issue of material fact on the issue of pretext.

Plaintiff contends that her firm stance on the players' violations of the university's policy against alcohol use by students

was a factor in her termination. Ms. Buck denied in her affidavit that plaintiff's stance on alcohol use was a factor in the decision of the players to complain about plaintiff. Buck Affid., Para. 17. However, even assuming that the players were motivated to complain about plaintiff due to her tough anti-alcohol stance, and even assuming that the defendants were aware of this motivation and agreed with the players' position, such a reason would be unrelated to the plaintiff's gender, and would not establish a discriminatory motive.

Plaintiff has failed to demonstrate the existence of a genuine issue of material fact in regard to her retaliation claims, and the defendants are entitled to summary judgment on those claims.

■ Plaintiff also contends that she was treated less favorably than male coaches who were experiencing problems around the same time period. In order to prove a claim of disparate treatment, the plaintiff must show: 1) that she is a member of a protected class; 2) that she was treated differently for the same or similar conduct than a non-protected person. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992). The plaintiff must show that she and the comparable person were similarly situated in all respects, in that they had the same supervisor, were subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances to distinguish their conduct or the treatment they received. *Id. See also Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)(plaintiff must prove that all relevant aspects of employment situation are nearly identical).

■ Plaintiff has produced evidence of problems which were experienced by Randy Ayers, the OSU basketball coach, including a sexual harassment complaint which was filed against Ayers and violations of the law committed by various basketball players in 1994 and 1995. Plaintiff notes that Mr. Ayers was accorded leniency by the defendants over these incidents, while she was given no quarter and was terminated. In response, the defendants point to the deposition testimony of Michelle Willis, p. 32, in which she states that at no point did any of the men's basketball team members complain to the Athletic Department about Randy Ayers. In contrast, defendants have produced evidence that plaintiff was terminated because the field hockey players complained about her performance as a coach and their lack of confidence in the plaintiff's abilities. Defendants further note that plaintiff and Ayers did not report to the same supervisor during the applicable time period, and that plaintiff was an employee at will, whereas Ayers had a multi-year contract. The evidence in the record fails to demonstrate that plaintiff's situation was comparable to that of Mr. Ayers.

Plaintiff also contends that she was treated less favorably than Jerry Welsh, the men's ice hockey coach. Complaints were made to the Athletic Department concerning Mr. Welsh's coaching. However, the defendants argue that Welsh was not treated substantially differently than the plaintiff because he was removed as head coach of the ice hockey program shortly after the complaints were made. Defendant Geiger testified at p. 71 of his deposition that "we went through a process not dissimilar to what we went through with the field hockey team and, in fact, decided to make a coaching change." No evidence has been produced to indicate that Welsh was treated substantially more leniently that the plaintiff.

Plaintiff further contends that Welsh was treated more favorably because he was given a six-month severance package when he was terminated, whereas plaintiff was given a three-month severance package, and because Welsh was given another position in the Athletic Department, whereas plaintiff was not offered another position. The defendants respond that Welsh was given a six-month severance

package because he had twenty years seniority, while plaintiff had only nine years of service. Deposition of Susan Henderson, pp. 33–34; 59–60. The defendants also point to evidence that Welsh was given the title of "Special Assistant to the Athletic Director," but that this position involved no job duties, and he was given this title simply because a new ice hockey coach had been hired and OSU did not want two persons with the title of ice hockey coach. Henderson Dep., p. 33. Thus, the title was apparently no more that mechanism for managing the payroll during the six-month severance period. Plaintiff indicated in her affidavits that male head coaches were offered positions in the Athletic Department by a previous athletic director, Jim Jones, following their termination. However, defendant Geiger stated in paragraph 9 of his affidavit that at the time of plaintiff's termination, there were no administrative positions open in the Athletic Department, and that during his tenure as athletic director, no terminated head coach, male or female, has been offered another position within the department. Plaintiff acknowledged in her deposition at pp. 28–30 that she did not apply for another position at OSU. Plaintiff has not submitted evidence sufficient to show that she was similarly situated to Welsh in the matter of severance pay, or that Welsh was treated more favorably.

Plaintiff also refers to certain other alleged violations of Title IX·in the form of inequities between men's and women's teams at OSU. Plaintiff refers in her affidavit to an alleged difference in resources allotted to men's and women's teams, the failure of the Athletic Department to timely submit paperwork to the NCAA to enable OSU to host the field hockey playoffs in 1994, the delay in replacing the artificial turf on the practice field, and the fact that coaches of certain high-profile sports are awarded multi-year contracts, whereas coaches of lesser sports are not.

This court questions whether plaintiff has standing to assert these Title IX claims in light of the fact that she is no longer employed as a coach at OSU. See Buntin v. Breathitt Cty. Bd. of Educ., 134 F.3d 796, 801 (6th Cir.1998); Rowinsky v. Bryan Independent School Dist., 80 F.3d 1006, 1009 n. 4 (5th Cir.1996)(no standing to assert rights of third parties under Title IX); Deli v. University of Minnesota, 863 F.Supp. 958, 962 n. 2 (D.Minn.1994)(questioning standing to bring Title IX claim on behalf of students when plaintiff was no longer coach). She is no longer in a position to seek injunctive relief compelling increased budgets for women's teams or multi-year contracts for women coaches, or to seek replacement of the artificial turf, which has already been replaced in any event. She has no standing to seek compensation on behalf of any hockey players who were injured on the old turf.

One court has noted that the facilities and supplies with which a coach is provided are a part of the coach's conditions of employment even though the same factors might be asserted by the students in a Title IX action. See O'Connor v. Peru State College, 781 F.2d 632, 642 n. 8 (8th Cir.1986). However, while plaintiff contends that the lack of an adequate budget and the poor condition of the artificial turf hampered her coaching performance and her ability to recruit players, there is no evidence that the players' complaints which led to plaintiff's termination were related in any way to plaintiff's inability to recruit talented players or the condition of the turf. Rather, the complaints related to plaintiff's lack of knowledge of the game of field hockey and her inability to relate to her players or to teach her players new strategies and techniques.

In addition, defendants have presented evidence that the delay in replacing the artificial turf was due to a lack of available funds, not to gender discrimination. The practice field in question was also used by the men's lacrosse team, and thus the failure to promptly replace the turf also impacted equally upon a men's team. No evidence has been submitted concerning

the circumstances of the Athletic Department's failure to timely process the application for hosting the play-off games in 1994 which would suggest that this failure was the result of intentional gender discrimination as opposed to mere administrative error.

Defendants note that only three coaches at OSU, the men's football coach and the men's and women's basketball coaches, have multi-year contracts. Therefore, there are many male and female coaches of both men's and women's teams who do not work under multi-year contracts.

Finally, defendants have produced evidence that plaintiff complained to defendant Geiger about her budget in the spring of 1994 on the basis that it was smaller than that of the women's soccer team. Plaintiff's Dep., pp. 492–493. The Athletic Department responded by giving plaintiff the largest budget increase for any program that year. Griffin Dep., p. 27. Defendant Griffin indicated that he did not consider plaintiff's gender in recommending a budget for the women's field hockey team. Griffin Affid., Para. 10. Plaintiff has produced no evidence other than her own conclusory allegations that the budget of the field hockey team was based in any way on the fact that it was a women's team. Plaintiff has not shown the existence of a genuine issue of material fact in regard to the above alleged violations of Title IX.

Plaintiff has not shown that a genuine issue of material fact exists in regard to her claims of disparate treatment, and defendants are entitled to summary judgment on those claims.

■ Defendants have also moved for summary judgment on plaintiff's claim under the Equal Pay Act. Under the Equal Pay Act, the plaintiff bears the burden of proving that the defendant employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]" *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); 29 U.S.C. § 206(d). The plaintiff must show that different wages were paid to employees of opposite sexes for substantially equal work. *Buntin,* 134 F.3d at 799 (equal work does not require that the jobs be identical, only that there exists a substantial equality of skill, effort, responsibility and working conditions); *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 752 (6th Cir.1985); *Odomes v. Nucare, Inc.,* 653 F.2d 246, 251 (6th Cir.1981).

■ If plaintiff is successful in proving a prima facie case, the burden then shifts to the employer to prove by a preponderance of the evidence that the compensation system in use is justified by one of the four exceptions set forth in § 206(d)(1)(i) through (iv): 1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) a differential based on any other factor other than sex. *Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1029 (6th Cir.1983).

■ There is no men's field hockey program at Ohio State or in the NCAA. Plaintiff contends that her position was substantially equal to that of the OSU ice hockey coach. In 1994–1995, plaintiff's salary was $35,592 based on a nine-month work year. In 1995–1996, plaintiff's salary was $47,460 based on a twelve-month work year. In comparison, Jerry Welsh, the ice hockey coach, was paid $41,304 in 1994–1995. In 1995–1996, OSU hired a new ice hockey coach at a salary of $65,000.

A plaintiff's comparison to a specifically chosen employee should by scrutinized closely to determine its usefulness. *Hein v. Oregon College of Education,* 718 F.2d 910 (9th Cir.1983)(plaintiff's prima facie case flawed where plaintiff chose a single employee for comparison because he was the highest-paid employee, not because he was the only comparable employee); *Hey-*

*mann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th. Cir.1981). Courts which have addressed the merits of Equal Pay Act claims advanced by coaches of athletic teams have been reluctant to find an equality of work between coaches of different sports. *See e.g. E.E.O.C. v. Madison Comm. Unit School Dist. No. 12*, 818 F.2d 577, 584 (7th Cir.1987)(rejecting findings of equality between boy's soccer and girl's volleyball and basketball teams and between boy's track and girl's basketball teams); *Deli*, 863 F.Supp. at 961 (women's gymnastic coach not substantially equal to men's football, hockey and basketball coaches).

In determining whether men's and women's coaching positions are equal, courts have looked to such factors as team size, the number of assistant coaches, recruiting responsibilities, the amount of spectator attendance and community interest in the sport, the amount of revenue generated by the sport, the degree of responsibility in the area of public and media relations and promotional activities, and the relative importance of the sport in the athletic program as a whole. *Stanley v. University of Southern California*, 13 F.3d 1313, 1321–1323 (9th Cir.1994); *Bartges v. University of North Carolina*, 908 F.Supp. 1312, 1323–1326 (W.D.N.C.1995) *aff'd*, 94 F.3d 641 (4th Cir.1996); *Deli*, 863 F.Supp. at 961; *Jacobs v. College of William & Mary*, 517 F.Supp. 791, 797 (E.D.Va.1980), *aff'd*, 661 F.2d 922 (4th Cir.1981).

In support of her argument that the two sports require equal skills, plaintiff refers to the deposition testimony of defendant Geiger, at p. 61, where he stated that the level of skill and knowledge required to function as the head coach of any sport is the same in that "[k]nowledge of the sport is an important factor." Plaintiff also notes that the women's field hockey coach is required to have a master's degree, whereas the men's ice hockey coach is only required to have a bachelor's degree. However, Geiger's testimony merely establishes that coaches of any sport are expected to perform at a certain level of expertise. Plaintiff points to no evidence that the particular knowledge or technical skills required to coach players in the sport of ice hockey are substantially similar to the knowledge or skills required to coach players in the sport of field hockey.

Plaintiff also claims that former Athletic Director Jim Jones stated that the men's ice hockey and women's field hockey teams were comparators for purposes of salary and budgetary matters. However, the time period and context of this unauthenticated statement are not provided, and it is contradicted by the deposition testimony of former Associate Athletic Director Phyllis Bailey, who stated that Mr. Jones viewed the two sports as being quite different. Bailey Dep., p. 22.

Plaintiff also argues that the jobs of ice hockey and field hockey coach require equal effort. She argues that the seasons for the two sports are comparable. However, the evidence shows that in 1993 to 1995, the competition season for field hockey spanned a little over two months, from the beginning of September until early November, with nineteen to twenty-one games. In contrast, the competition season for ice hockey during that same period was five months, with thirty-five to thirty-eight games. Plaintiff notes that field hockey also includes an indoor, noncompetitive season from mid-January to mid-April. However, there is no evidence that a noncompetitive practice season equates with a similar period of time spent in active competition. The average team size for field hockey varied from sixteen to twenty players, whereas the ice hockey team included from twenty-three to twenty-seven players. According to defendant Geiger, factors such as the number of players on a team, the number of games and the length of a team's season effect the amount of work each coach is required to perform. Geiger Affid., Para. 11.

Defendants argue that the position of field hockey coach is much more comparable to the men's lacrosse and soccer teams.

From 1993 to 1995, the men's lacrosse team had a competitive season from March to early May, a little over two months, and played eleven to fourteen games with approximately thirty-three players. In 1994 and 1995, the men's soccer team played nineteen to twenty games from September to early November, a little over two months, and had twenty-two to twenty-five players. The men's lacrosse coach was paid less than plaintiff, earning $27,600 in 1994–1995 and $40,000 in 1995–1996. The men's soccer coach was also paid less than plaintiff, earning $29,628 in 1994–1995 and $40,000 in 1995–1996.

The record also reveals that in many instances, women coaches were paid more than their male counterparts in the same sport. Exhibits E and F to the Henderson Affidavit reveal that in the 1994–1995 and 1995–1996 seasons, the OSU women's soccer, swimming and volleyball coaches were paid more that the men's soccer, swimming and volleyball coaches.

Plaintiff argues that both the ice hockey and field hockey coaching positions involve the same basic tasks such as organization, development and implementation of the program, preparation of schedules, recruitment of athletes, ordering equipment and uniforms, budget management, instruction of athletes, and the selection and coaching of players. However, the same general tasks could be said to apply to any coaching job. According to defendant Geiger, the men's ice hockey coach has a greater burden in the public relations area, including press interviews, audience development and marketing than other sports, including field hockey. Geiger Affid., Para. 11. In addition, men's ice hockey "is one of the more popular sports at OSU and is one of the few sports to generate revenue[.]" *Id.* The ice hockey program generated $68,933 in revenue in 1994–1995 and $55,467 in 1995–1996, making it the fourth highest revenue-generating sport behind football and men's and women's basketball. Henderson Affid., Para. 4. There is no evidence that coaching the

women's field hockey team involved a similar degree of public relations responsibilities or that the field hockey team generated any revenue for OSU.

Plaintiff summarily argues that the working conditions of the filed hockey and ice hockey coaching jobs are the same. However, she points to no evidence that the surroundings and hazards of the two jobs are the same.

The court concludes that plaintiff has failed to produce evidence sufficient to show that she could meet her burden of proving that the positions of men's ice hockey and women's field hockey coach are substantially identical under Equal Pay Act standards.

Additionally, defendants have offered evidence bearing on the statutory exceptions to the Equal Pay Act. Defendant Geiger stated that the salary paid to Jerry Welsh, the head men's ice hockey coach, was based in part on his seniority of twenty years and merit raises. *See* 29 U.S.C. § 206(d)(1)(i) and (ii). Geiger Affid., Para. 15.

Defendants also consulted information concerning the market rate for coaches' salaries in the Big Ten, as well as the NCAA Texas Survey, which collects statistics from eighty-five Division 1–A schools across the country. Geiger Affid., Paras. 12–14; Henderson Affid., Para. 3. Defendants argue that the market rate is a "factor other than sex" under 29 U.S.C. § 206(d)(1)(iv). Unequal wages that reflect market conditions of supply and demand are not prohibited under the Equal Pay Act. *Stanley,* 13 F.3d at 1322.

Former Associate Athletic Director Phyllis Bailey testified and pp. 23–24 of her deposition that the market rate differed between field hockey and ice hockey because there are more ice hockey programs than field hockey programs, and professional ice hockey teams recruited the best college coaches to coach in the professional league, whereas there is no professional field hockey.

The evidence reveals that plaintiff's salary was well above the average market rate for women field hockey coaches. Plaintiff's salary in 1995–1996 was $47,460, whereas the Big 10 average was $42,000 and the NCAA average was $36,649. Jerry Welch's salary of $41,304 for 1994–1995 was nearly half the Big Ten average of $77,650 for men's ice hockey. John Markell, who replaced Welsh as the men's ice hockey coach in the 1995–1996 season, was paid $65,000, less that the average salary of $86,892, because he had no previous experience as a head coach.

Plaintiff contends that the wage discrepancy is not justified in this case because the field hockey team had a better win/loss record and the academic performance of the women field hockey players was better than that of the ice hockey players. As to the latter, it is not clear how plaintiff can claim credit for the academic record of her players. Further, the Equal Protection Act does not require wages based on objective factors of "comparable worth" as opposed to factors such as market conditions of supply and demand. *Equal Employment Opportunity Commission v. Madison Community Unit School Dist.*, 818 F.2d 577 at 580(7th Cir.1987). While plaintiff cites non-binding Equal Employment Opportunity Commission guidelines published in October of 1997 which call for a comparable worth analysis, such guidelines do not have the effect of agency regulations and are not entitled to deference. *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 841 (6th Cir.1994).

Plaintiff further argues that market rate should not be a defense when the market values are depressed by discrimination. However, there is no evidence that discrimination has played any role in establishing the market rates for field and ice hockey coaches. In any event, market factor increases in salaries may be necessary to maintain a strong coaching staff, even if the pay increases happen to be in areas which are dominated by men. *See Craik v. Minnesota State Univ. Bd.*, 731

F.2d 465, 480 (8th Cir.1984). The Sixth Circuit has held that an employer may follow the market rate, and that the failure to rectify traditional wage disparities that exist in the marketplace between predominantly male and predominantly female jobs is not actionable. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. State of Michigan*, 886 F.2d 766, 769 (6th Cir.1989). The Sixth Circuit has also determined that a "factor other than sex" means a factor adopted for a legitimate business reason and used reasonably in light of the employer's stated purpose, and that an action for which an employer has a legitimate business reason is valid even if it has a disparate impact upon women. *E.E.O.C. v. J.C. Penney Co., Inc.*, 843 F.2d 249, 252–253 (6th Cir.1988).

To the extent that plaintiff advances the failure of OSU to extend multi-year contracts to the coaches of minor sports as an Equal Pay Act violation, that claim is also unsupported by the evidence. As noted previously, only the men's football coach and the men's and women's basketball coaches are given multi-year contracts. There is no evidence that the job of women's field hockey is substantially identical to any of these multi-year positions, and a substantial number of male coaches of comparable minor sports teams are impacted equally with female coaches by this policy.

The court concludes that plaintiff has failed to produce evidence sufficient to show that she could prove a prima facie case under the Equal Pay Act. The defendants have also produced sufficient evidence to prove their defense that the difference in wages between plaintiff and the ice hockey coach was based on merit and seniority factors and on market rate, a factor other than sex. Plaintiff has not offered evidence sufficient to dispute or to raise a genuine issue of material fact on the issue of defendants' Equal Pay Act defense. Accordingly, defendants are entitled to summary judgment on plaintiff's Equal Pay Act claim.

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety. Plaintiff has filed a motion to dismiss her § 1983 claim without prejudice. In light of the court's ruling on the defendants' motion for summary judgment, which applies equally to plaintiff's § 1983 claim, plaintiff's motion to dismiss her § 1983 claim without prejudice is moot and it is hereby denied. The clerk will enter judgment in favor of the defendants at plaintiff's costs.